**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| KEVIN STRICKLAND,<br><br>Plaintiff,<br><br>v.<br><br>KANSAS CITY, MISSOURI BOARD OF POLICE COMMISSIONERS, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 4:23-cv-00313-DGK |

**ORDER ON EVIDENTIARY ISSUES**

Plaintiff Kevin Strickland brings this lawsuit under 42 U.S.C. § 1983 against the Kansas City, Missouri Board of Police Commissioners (the "Board") and five Kansas City, Missouri Police Department officers (the "Officers"). He alleges Defendants violated his constitutional rights and that this unconstitutional conduct caused his wrongful conviction for murder in 1979. Although Plaintiff originally brought ten counts against Defendants, ECF No. 1-2, he has dropped all claims against the Board and only three counts remain against the Officers: (1) a § 1983 due process claim for fabricating evidence, withholding evidence, and conducting a reckless investigation ("Count 1"); (2) a § 1983 civil rights conspiracy claim ("Count 2"); and (3) a state law malicious prosecution claim ("Count 4"). *See* ECF No. 102 (amended complaint listing four claims); ECF No. 157 at 142[1] n.4 (Plaintiff dropping municipal liability claim ("Count 3") in summary judgment briefing). The case is at the summary judgment stage.

On March 25, 2025, the Court ordered the parties to provide supplemental briefing on evidentiary issues arising from the parties' summary judgment filings. ECF No. 174. The Court

[1] ECF page number references are to the ECF imprinted numbers.

has thoroughly reviewed the briefs and the record and issues this Order. The Court will issue a separate order setting a revised briefing schedule for summary judgment and any *Daubert* issues.

## Legal Standard

"There are limits on what kinds of evidence a judge may consider in reviewing a motion for summary judgment, and inadmissible evidence obtained during discovery cannot be used to defeat such a motion." *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003). But "[t]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019). "A district court has broad discretion in the admission of evidence," *United States v. Eagle*, 515 F.3d 794, 801 (8th Cir. 2008), and the Eighth Circuit "review[s] the admission of evidence for consideration at the summary judgment stage for an abuse of discretion," *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).

## Discussion

The Court identified two overarching concerns in its order for supplemental briefing: inadmissible hearsay, Fed. R. Evid. 802, and danger of confusing the issues, Fed. R. Evid. 403. The parties have thoroughly briefed the issues in accordance with the Court's order. Defendants have also raised relevance objections. The Court first addresses Defendants' relevance objections and Rule 403. The Court then addresses the various hearsay issues, first as to Plaintiff's evidence and then as to Defendants'.

### I. Plaintiff's innocence evidence is relevant.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R.

Evid. 401. "The standard for relevancy is low." *United States v. Holmes*, 751 F.3d 846, 851 (8th Cir. 2014).

Defendants object to multiple pieces of evidence concerning Plaintiff's actual innocence, arguing the evidence is irrelevant to liability in his civil rights claims.[2] They cite an Eighth Circuit case to support their argument,[3] but that case speaks to the exclusion of evidence of guilt, not innocence, in a § 1983 claim, and is therefore of limited application here. *See White v. McKinley*, 605 F.3d 525, 538 (8th Cir. 2010).[4] Plaintiff, by contrast, points to cases where courts[5] have admitted evidence of innocence at the liability phase of a § 1983 case. *See Gilliam v. Allen*, 62 F.4th 829, 839–40 (4th Cir. 2023) (affirming admission of innocence evidence (Governor's pardons) because the admission did not preclude defendants from asserting that guilty verdicts "*were not attributable to their misconduct*") (emphasis in original); *Restivo v. Hessemann*, 846 F.3d 547, 559 (2d Cir. 2017) ("Plaintiffs were not required to prove their innocence to win on their [§ 1983] claims at trial. However, the evidence of their innocence provides an important backdrop for their claims at trial."); *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) (evidence

---

[2] Defendants concede that innocence evidence may be relevant to damages. ECF No. 180 at 22 n.11.

[3] Defendants also cite this Court's Order, ECF No. 174, which states that Plaintiff's innocence is not before the Court in this case. *Id.* at 7. True enough. But the Court made that statement with reference to confusion of the issues under Rule 403, not relevance. *Id.*

[4] The Court also notes that Defendants' citation to *White v. McKinley* in their Rule 403 argument verges on misrepresentation. Defendants use *White* to support the proposition that "the word 'innocence' . . . is extremely 'inflammatory and collateral' and will lead to a decision on an improper basis." ECF No. 180 at 33–34 (citing *White*, 605 F.3d at 537). But the Eighth Circuit addressed admission of evidence of the § 1983 plaintiff's guilt (i.e., the investigation evidence) in *White*, and it was evidence of guilt—of child sex abuse—not innocence, that the court held was "inflammatory and collateral."

[5] The one Eighth Circuit case Plaintiff cites addresses innocence only obliquely, noting in passing that the § 1983 Plaintiff, alone among the suspects in a murder case, maintained his innocence during the criminal prosecution. *See White v. Smith*, 696 F.3d 740, 756 (8th Cir. 2012). But the Eighth Circuit did not directly address the issue of innocence evidence's relevance to § 1983 liability in *White v. Smith*.

of § 1983 plaintiff's innocence was relevant to liability because it increased the likelihood that police officers fabricated evidence to secure conviction).

While none of Plaintiff's relevant cases is binding on this Court, the Court finds their reasoning to be persuasive. Following the Sixth Circuit, and as a simple matter of logic, if Plaintiff is actually innocent of the crimes for which he was convicted, it is less probable that there would be authentic evidence against him. Consequently, it is more probable—even if only slightly—that the Officers obtained evidence against him through pressure or fabrication than would be the case if he were guilty.[6] As such, Plaintiff's innocence is relevant, though by no means dispositive. Therefore, the Court will not exclude Plaintiff's innocence evidence as irrelevant.

## II. The Court will not exclude evidence under Rule 403 at this time.

Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury . . . ." The rule "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis." *Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981).

Both parties raise Rule 403 objections, and while the Court directed the parties to brief the Rule 403 issues, after considering their arguments, the Court decides it will not exclude evidence under Rule 403 for purposes of summary judgment. Issues of prejudice, confusion, and misleading the jury pertain to jury trial and are of limited, if any, concern at summary judgment. *See In re RFC & ResCap Liquidating Tr. Action*, No. 013CV3451SRNHB, 2018 WL 4929394, at *1 (D.

[6] To be clear, Plaintiff's innocence makes fabrication "more probable," not "more probable than not." That is, Plaintiff's innocence does not satisfy the preponderance-of-the-evidence standard by itself. Rather, Plaintiff's innocence simply increases the probability of fabrication.

Minn. Oct. 11, 2018) ("[T]he Court must be more attuned [at jury trial] to the 'danger[s] of . . . unfair prejudice, confusing the issue, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence,' than were this a bench trial or summary judgment hearing." (quoting Fed. R. Evid. 403)). Accordingly, while the Court's concerns about unfair prejudice, confusing the issues, cumulative evidence, and mini-trials on collateral issues remain, the Court will wait until trial to exclude evidence—if any—under Rule 403.

### III. Hearsay Issues in Plaintiff's Evidence[7]

Plaintiff's evidence raises numerous hearsay issues. Hearsay is an out-of-court statement offered for the truth of the matter asserted, Fed. R. Evid. 801, and is inadmissible unless subject to an exception, *id.* 802.

Before turning to the specific statements, the Court notes that Defendants make hearsay objections to statements offered by various witnesses—including Plaintiff—from prior proceedings. While these statements are hearsay, the issue at summary judgment is whether the evidence could be offered at trial in an admissible form. *Kilgore*, 926 F.3d at 485. These declarants made their statements under oath, and, even when an opposing party "did not participate in the taking of the statement, a sworn statement taken under oath is at least as reliable as an affidavit for the purposes of Rule 56(c)." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 403 (8th Cir. 1995). Moreover, the availability of declarants to testify about the substance of their own sworn hearsay statements generally makes the substantive evidence admissible. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) ("The most obvious way that

[7] Plaintiff disclaims reliance on the following: The U.S. Attorney's investigation findings, *e.g.*, ECF No. 157, Pl's SOF ¶¶ 10, 272; Quinton Lucas's statements and findings*, e.g.*, ECF No. 157, Pl's SOF ¶¶ 10, 273; Nathan Garret's statements and findings, *e.g.*, ECF No. 157, Pl's SOF ¶¶ 10, 274; John O'Connor's statements and findings, *e.g.*, ECF No. 157, Pl's SOF ¶¶ 10, 244; Other comments and statements from public officials, *e.g.*, ECF No. 157, Pl's SOF ¶ 10. *See* ECF No. 177 at 19 n.5.

hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial.”). The declarants are available for trial,[8] so the Court treats their sworn statements as it would depositions, affidavits, or declarations for purposes of summary judgment. Fed. R. Civ. P. 56(c)(1)(A). Of course, the Court must address any multiple hearsay contained within these statements separately. *See* Fed. R. Evid. 805.

That said, the Court addresses each statement or class of statements in turn.

**a. Cynthia Douglas’s statements**

Cynthia Douglas identified Plaintiff as one of the perpetrators of the triple murder at a police lineup the day after the crime and offered eye-witness testimony likewise identifying Plaintiff at trial. Douglas’s testimony was decisive in Plaintiff’s conviction. Plaintiff alleges Douglas later told third parties that she misidentified him due to police pressure. Defendants argue these statements are inadmissible hearsay. Plaintiff argues these statements are admissible under Rule 804(b)(3) (statements against interest), Rule 803(3) (state of mind), and/or Rule 807 (the residual hearsay exception).

As a preliminary matter, Plaintiff argues in a footnote that at least one instance of third-party testimony about police pressure on Douglas is not hearsay at all. *See* ECF No. 177 at 21 n.8. Douglas’s sister Cecilia Simmons testified that she personally observed the police pressuring Douglas to identify Strickland. When asked if she observed detectives pressuring Douglas, she answered, “Yes.” Simmons Dep. at 22.15, ECF No. 157-19. When asked to describe how the detectives were treating Douglas, Simmons answered, “Their tone was kind of loud and kind of mean because they are not liking her answers, I guess. I don’t know.” *Id.* at 25.8–10. When

[8] *See* ECF No. 177 at 29 (“Each cited witness is alive, was listed in Plaintiff’s Rule 26 disclosures, and is available to testify at trial.”).

asked, "at any time when you were present for the interview with the detectives at the Tracy house[9] where they are questioning Cindy about Nardi,[10] did she ever tell the detectives she saw with her eyes, Nardi?," Simmons answered, "No, no." *Id.* 24.7–12. Simmons also testified, "[Douglas] never said I actually saw Nardi," and when asked again, "during the conversation that you witnessed with the police did Cynthia ever say Nardi is the person she saw?," Simmons answered, "No, she did not." *Id.* at 49.14–15, 29–22.

This testimony does not contain hearsay. Simmons testified from personal knowledge based on her observations of what the police officers were doing. *See* Fed. R. Evid. 602. In the instances quoted above, she did not report a statement by Douglas; she only testified that Douglas never said during the police interview that she saw Plaintiff.[11] This evidence is admissible.

**1. Douglas's statements that she misidentified Plaintiff at trial are statements against interest, but her statements about police pressure are not.**

The Rules of Evidence except statements against interest from the general rule against hearsay. A statement against interest is one "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3). Only the self-inculpatory portions of a statement are admissible under the rule; collateral statements, whether self-exculpatory or neutral,

[9] 7331 Tracy, where Cynthia Douglas was living at the time.

[10] Plaintiff is referred to throughout the record as "Nardi," "Nordy," and "Naudi," which are variations (or misconstruals) of his nickname.

[11] In the same footnote, Plaintiff also asserts, "And [Douglas's] sister [Simmons] *personally witnessed* Douglas telling Defendants 'I don't know who it was,' not identifying Strickland." (emphasis in the original). But personally witnessing an out-of-court statement offered for its truth doesn't make the statement any less hearsay. Plaintiff does not say how the statement "I don't know who it was" is offered for anything other than its truth, so it is only admissible if it is subject to an exception.

are not. *See Williamson v. United States*, 512 U.S. 594, 599–600 (1994) (holding that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"); *United States v. Edwards*, 159 F.3d 1117, 1127 (8th Cir. 1998) ("[E]xculpatory out-of-court declarations are not admissible hearsay, even if they include a statement against the declarant's penal interest.").

Plaintiff divides Douglas's statements into two essential components: (1) that she falsely identified Plaintiff as a murderer under oath; and (2) that she did so as a result of police pressure. *See, e.g.*, Pl.'s Additional SOF ¶ 17, ECF No. 157 at 92. He contends both components were against her penal interest because they could expose her to a charge of perjury or to civil liability.

Plaintiff is correct as to Douglas's sworn testimony against him. Admitting to falsely identifying a criminal defendant at trial can expose someone to a charge of perjury and is therefore a statement against interest under Rule 804(b)(3). *See Beckett v. Ford*, 384 F. App'x 435, 444 (6th Cir. 2010) (holding declarant's statement after trial that he had no prior knowledge of the defendant's involvement in a murder, when declarant had testified at trial implicating the defendant in the murder, "subject[ed him] to charges of perjury and a civil suit from [the defendant]" and was therefore a statement against interest under Rule 804(b)(3)); *Annunziata v. City of New York*, No. 06 CIV. 7637 (SAS), 2008 WL 2229903, at *9 (S.D.N.Y. May 28, 2008) (holding declarants statements "recanting his identification of [§ 1983] plaintiff as one of the shooters" in a criminal case "could have exposed him to criminal liability for perjury" and were therefore "admissible under Rule 804(b)(3) as statements against interest").

But Douglas's statements about police pressure are not statements against interest, because they inculpate someone else (the Officers) and do not expose her to criminal or civil liability.[12]

[12] Plaintiff appears to argue that the statements about police pressure could also have subjected her to perjury charges, "because she testified to the contrary during the criminal proceedings." ECF No. 177 at 22. But Plaintiff's citations

*See United States v. Chase*, 451 F.3d 474, 480 (8th Cir. 2006) ("A statement is not truly self-inculpatory if it merely attempts to shift blame . . . ."); *Beckett v. Ford*, 384 F. App'x 435, 444 (6th Cir. 2010) (hearsay declarant "did not incur any criminal or civil liability by stating that" his false testimony was due to police coercion).

Accordingly, Douglas's statements that she misidentified Plaintiff at trial are admissible as statements against interest, but her statements about police pressure are not.

**2. Douglas's email to the Midwest Innocence Project and statements to friends and family that she wanted to "right her wrong" are not admissible under Rule 803(3).**

"A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed" is not excluded by the rule against hearsay. Fed. R. Evid. 803(3). "A key circumstantial guarantee of trustworthiness in respect to Rule 803(3) is that it requires that statement be contemporaneous with the declarant's 'then existing' state of mind." *United States v. Naiden*, 424 F.3d 718, 722 (8th Cir. 2005). "Declarations about a past attitude or state of mind are less likely to be reliable because trustworthiness is diminished if a declarant has had the time to reflect on the potential implications of his conduct." *Id.* (citation and internal quotation marks omitted).

Plaintiff's argument appears to be that Douglas's various statements to family and friends about her intention "to right her wrong" are statements of her "then-existing state of mind" showing a motive, intent, or plan to try to secure Plaintiff's freedom. This, in turn, is evidence that the email to the Midwest Innocence Project, which declared her misidentification, is authentic. Defendants argue Douglas's statements are statements of memory or belief offered to prove the

---

to the two trials, ECF 157-4 at 99 and ECF No. 157-5 at 361, do not show Douglas answering any questions about police pressure.

fact remembered or believed (i.e., misidentification of Plaintiff due to police pressure) and thus outside of Rule 803(3).

Defendants are correct about the scope of Rule 803(3). Plaintiff offers the email, which is essentially a statement of belief (that Douglas wrongfully identified Plaintiff), to prove the fact believed. This takes the email outside of Rule 803(3).[13]

**3. Douglas's statements to Cecilia Simmons immediately after the lineup are admissible under Rule 807, but Douglas's statements to Officers at the hospital the night of the crime and at 7331 Tracy the next day and to other family and friends in later years are inadmissible.**

Under Rule 807, a hearsay statement that is not admissible under Rule 803 or 804 is nevertheless admissible if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. The Rule "permits the admission of hearsay if (1) it has circumstantial guarantees of trustworthiness that are equivalent to those accompanying the enumerated hearsay exceptions; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other reasonably available evidence; and (4) its admission would best serve the purposes of [the Rules of Evidence] and the interests of justice." *United States v. Bruguier*, 961 F.3d 1031, 1033 (8th Cir. 2020). "Congress intended the residual hearsay exception to be used

[13] Indeed, Plaintiff does not address Defendants' Rule 803(3) argument in his reply, focusing instead on issues of relevance and authentication. While the email may be relevant to Plaintiff's innocence and Douglas's misidentification and capable of authentication, this does not save the email from the general rule against hearsay, which is a separate issue from both relevance and authentication. *See United States v. Picardi*, 739 F.3d 1118, 1126 (8th Cir. 2014) (affirming exclusion of inadmissible hearsay "whether or not it was relevant"); *Fraserside IP L.L.C. v. Netvertising Ltd.*, 902 F. Supp. 2d 1165, 1180 n.9 (N.D. Iowa 2012) ("Even if Fraserside had properly authenticated the internet printouts, whether the information drawn from those printouts constitutes inadmissible hearsay remains.").

very rarely, and only in exceptional circumstances." *United States v. Sully*, 114 F.4th 677, 685 (8th Cir. 2024) (citations and internal quotation marks omitted).

The Court has held that Douglas's admissions to misidentifying Plaintiff under oath were statements against interest under Rule 804(b)(3). The only question for Rule 807, therefore, is whether her statements about police pressure satisfy the residual exception standard. And because they are indisputably material to, and more probative than any other evidence (they are the only evidence) of, the alleged police pressure, the Court only needs to consider whether (A) they have sufficient circumstantial guarantees of trustworthiness and (B) their admission would best serve the purposes of the Rules of Evidence and the interests of justice.

**A. Circumstantial guarantees of trustworthiness**

As with the other hearsay exceptions, the focus of Rule 807 is trustworthiness. To make a trustworthiness determination, the Eighth Circuit looks both to the totality of the circumstances under which the statement was made and the trustworthiness of the declarant. For hearsay to be admissible under Rule 807, there must be "surrounding circumstances indicative of a strong propensity for truthfulness," as is the case "in the traditional hearsay exceptions." *United States v. Love*, 592 F.2d 1022, 1027 (8th Cir. 1979); *see also United States v. Halk*, 634 F.3d 482, 489 (8th Cir. 2011) (using "a broad totality of the circumstances test"). Rule 803 and 804's hearsay exceptions are admissible, because they are "so trustworthy that adversarial testing would add little to their reliability." *United States v. Stoney End of Horn*, 829 F.3d 681, 686 (8th Cir. 2016) (citation omitted). A statement admitted under Rule 807 must have this same level of trustworthiness and reliability. And each statement must satisfy Rule 807 on its own. *See Stoney End of Horn*, 829 F.3d at 686 ("[T]his trustworthiness must be gleaned from circumstances that surround the making of the statement and that render the declarant particularly worthy of belief,

not by bootstrapping on the trustworthiness of other evidence at trial.") (citation and internal quotation marks omitted); *see also Idaho v. Wright*, 497 U.S. 805, 819 (1990) ("[T]he relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief."). The credibility of the witness reporting the hearsay, however, is a question for the jury. *See* Fed. R. Evid. 807, 2019 Advisory Committee Notes. ("The credibility of an in-court witness does not present a hearsay question. To base admission or exclusion of a hearsay statement on the witness's credibility would usurp the jury's role of determining the credibility of testifying witnesses.").

Plaintiff argues no reasonable person would try to get someone out of prison if she believed she had correctly identified him as her shooter. The only reasonable explanation for Douglas's statements that she misidentified Plaintiff due to police pressure, therefore, is that she believed them to be true. Plaintiff also points to the many different people Douglas told over many decades and argues she had no reason to lie to these people. Defendants argue the statements do not satisfy Rule 807 because (1) they involve hearsay within hearsay; (2) they are contradicted by Douglas's unprompted statements to police and her sworn testimony; (3) they are vague; (4) they are untrustworthy due to the passage of time; and (5) they are exculpatory and therefore unreliable.[14]

**i. Douglas's statements to Cecilia Simmons**

Douglas's sister Cecilia ("Cookie") Simmons reported statements Douglas made about police pressure at the 2021 vacatur hearing in the Circuit Court of Jackson County, Missouri, and in her deposition for this case. The core of Simmons' testimony at the 2021 hearing is as follows:

> [Douglas] said, Cookie, I never did choose him. She said that the detectives told me that's who it was. She said it wasn't no one but some white people and one black person [in the lineup]. They threw the book on the floor. It fell open. And then when I picked it up, they said, you still don't see him? You didn't see him?

[14] Defendants also argue here that Douglas's misidentification and Plaintiff's innocence are not necessary or highly probative of the issue of police misconduct. The Court addressed these concerns above.

> She said, no, I don't see him. They said, what you mean? There he is, right there. They pointed to Kevin Strickland. They told Cindy it was Kevin Strickland. Cindy did not know Kevin Strickland from this black microphone. . . . Cindy felt she was being interrogated, being told what to say, told who to identify, and that she better cooperate or none of them is going to get time for doing this. That if she don't cooperate with these detectives or the prosecutor, that all of them might get off. So then you're not going to have any justice. . . . Said they scared her. They interrogated her. Wouldn't let her go home. Made her feel like she was in trouble, like she had done something wrong.

ECF 157-6 at 66–75. Generally, statements to family, like these, are trustworthy. *See Bishop v. White*, No. 16 C 6040, 2023 WL 35157, at *9 (N.D. Ill. Jan. 4, 2023) ("[S]peaking with friends and family members in unguarded conversations provides circumstantial guarantees of trustworthiness"). And the descriptions of what the police were allegedly doing are specific, another indication of trustworthiness. *See United States v. Collins*, 66 F.3d 984, 987 (8th Cir. 1995) (finding statements that were "vague and easily susceptible to multiple interpretations" untrustworthy under the residual hearsay exception). But Simmons does not indicate when or where Douglas made these statements or describe the circumstances in which she made them.

Simmons' deposition testimony, however, does not have those deficiencies. The core of this testimony is as follows:

> Q. So, at the hospital that night did Cynthia ever give you any indication that Nardi Strickland or Kevin Strickland was a person she saw, when you were at the hospital?
>
> A. No, she never did say nothing like that.

Simmons Dep. 11.5–9, ECF No. 157-19

> Q. And when she was—when you were there [at 7331 Tracy the next day] and the detectives were asking Cindy about Nardi, did Cindy ever tell the detectives that Nardi is the person she saw at the scene?
>
> A. Yes, she said that, because that's what had been told to her. . . . She was telling the detective that Marcus called her and told her that Nardi called him and said tell Cindy keep his name out of that and stuff like that."

*Id.* 20.14–17, 19–20; 21.5–8.

> Q. During the meeting at the house [7331 Tracy] that you were present for, did Cindy tell the detectives that she wasn't sure if Nardi was the person she actually saw?
>
> A. Yes.

*Id.* 21.22–22.1.

> Q. And you said before that Cindy was telling them, the detectives, she wasn't, at the house, wasn't sure.
>
> A. Sure, yes.
>
> Q. What do you remember her saying?
>
> A. She said I didn't see the other two, I couldn't see them because it was dark and he stood, they stood in the shadows of the room. And she could see clearly the two that she identified because she knew them . . . .

*Id.* 23.20–24.4.

> And then [a detective or a policeman] told her if you want to go home [from the police station], you need to choose him, choose him [from the lineup]. And then he took the book and he threw it down and it opened, and it opened, it was open, and the page had Nardi on there. And he said, is that him? Ain't that him? If you choose him and sign here, you can go home. That is what she told me when she came out from back there.

*Id.* 30.17–24.

> Q. Now, when was the first time she told you that she wasn't sure and had been told who to pick by the police? . . .
>
> A. That day, that day, that day.
>
> Q. The day of the lineup?
>
> A. The day of the lineup, uh-huh.

*Id.* 34.8–10, 12–14.

> Q. When was the first time Cynthia told you that when she was at the station away from you and your dad, police told her who to pick?

> A. When she came from back there.
>
> Q. So April 26, 1978?
>
> A. Yes, yes.

*Id.* 31.24–32.4.

> Q. So I want to narrow down to a very specific period of time which is the first hours after the crime. So, you have already told us that the entire night, up through the hospital, Cynthia Douglas ever [sic.] never said anything about Nardi, is that right?
>
> A. Right. Not to my recollection, no.
>
> Q. She never told you Randy said Nardi, right?
>
> A. Nope, not until the next morning is when all this came about.

*Id.* 43.4–14.[15]

Douglas's statements to law enforcement at the hospital and at 7331 Tracy lack the trustworthiness and reliability of the recognized hearsay exceptions and therefore do not satisfy Rule 807. But her statements to Simmons immediately after the lineup are trustworthy. Plaintiff does not offer an analogous exception to show the trustworthiness of these statements. But comparison with the closest possibility, present sense impression under Rule 803(1), shows why Douglas's statements at the hospital and the Tracy house fail the Rule 807 trustworthiness standard while the statements after the lineup satisfy it.

"A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the rule against hearsay. Fed. R. Evid. 803(1). This is because "statements about an event and made soon after perceiving that event are especially trustworthy because 'substantial contemporaneity of event and statement negate the likelihood of

---

[15] As noted above, insofar as Simmons testified to what she observed, including that she did not observe Douglas positively identify Plaintiff, Simmons' testimony is not hearsay.

deliberate or conscious misrepresentation.'" *Navarette v. California*, 572 U.S. 393, 399–400 (2014) (quoting Fed. R. Evid. 803(1), Advisory Committee's Notes). While "[t]here is no per se rule indicating what time interval is too long under Rule 803(1)," *United States v. Dean*, 823 F.3d 422, 427 (8th Cir. 2016), the Eighth Circuit generally reckons an acceptable interval of time in terms of minutes. *See, e.g.*, *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995) (noting cases where 911 calls made two to three minutes and sixteen minutes after a shooting were sufficiently contemporaneous for present sense impression); *United States v. Earley*, 657 F.2d 195, 198 (8th Cir. 1981) (holding declarant's statement to witness immediately after declarant hung up the phone satisfied Rule 803(1)); *United States v. Manfre*, 368 F.3d 832, 839–40 (8th Cir. 2004) (holding three- to four-hour interval between event and statement was too long to satisfy Rule 803(1)); *see also United States v. Hall*, No. 24-CR-303 (SRN/DLM), 2025 WL 1319205, at *1–2 (D. Minn. May 7, 2025) (finding "[a] 13-minute interval is sufficient time for a person to prepare a deliberate or conscious misrepresentation and for the spontaneity of immediate observances to dissipate" and therefore excluding statement made thirteen minutes after the event).

Additionally, when a statement is made after an event it describes such that the statement and event are "part[s] of a single, continuous event," the statement may be admissible as a present sense impression. *United States v. Beck*, 122 F.3d 676, 681–82 (8th Cir. 1997) (admitting statements made by confidential informant to police officer immediately after confidential informant walked out of a house after a controlled drug and gun buy and told the officer that he had purchased them from the defendant, because the buy and the subsequent statement describing it "were part of a single, continuous event" and thus a present sense impression under Rule 803(1)).

The statements at the hospital and the Tracy house were made hours after the event, on the next day in the case of the statements at the house. This time interval is too great to qualify the statements as analogous to present sense impressions.

Douglas's experience at the police station lineup and her statements immediately after, by contrast, are parts of a single, continuous event. Simmons testified that she and her father went to the police station in their own car and waited for Douglas to come out. Simmons Dep. 26.22–25. When Douglas came out, she told Simmons the police told her whom to pick and would not let her leave until she identified Plaintiff. *Id.* 30.23–24 ("That is what she told me when she came out from back there."). In other words, Douglas reported the police conduct to Simmons immediately after it allegedly occurred. Unlike the statements at the hospital and the Tracy house, the statement about the lineup and the lineup itself have the substantial contemporaneity to negate the likelihood of deliberate or conscious misrepresentation. The lineup and Douglas's statement to Simmons when she came out "were part of a single, continuous event," and Douglas's statement therefore qualifies as analogous to a present sense impression. *See Beck*, 122 F.3d at 681–82.

As to Douglas's trustworthiness and possible motivations for her statements after the lineup, Douglas was not averse to identifying the perpetrators of the crime—she had already identified Bell and Adkins—so it is unlikely that she was trying to avoid being known as an informant by blaming the police for her identification of Plaintiff. Nor was she motivated by remorse for assisting in the wrongful conviction and incarceration of Plaintiff or by a desire to put the blame on someone else for it to try to rehabilitate her image in the community. At the time of the statements to Simmons after the lineup, Plaintiff had not yet been charged with, let alone convicted of, the crimes.

The Court concludes, therefore, that Douglas's statements to Simmons immediately after the lineup are trustworthy under the totality of the circumstances, by analogy to the present-sense-impression exception, for Rule 807 purposes. Douglas's statements to police officers at the hospital the night of the crime and at the Tracy house the day after the crime, however, are untrustworthy because of the passage of time.

**ii. Douglas's statements to other family and friends**

Plaintiff also seeks to admit statements Douglas made to her daughter (Sherri Jordan), her ex-husband (Ronald Richardson), her mother (Senoria Douglas), a childhood friend and local journalist (Eric Wesson), and a coworker (Laurie Maytubby). In general, these statements tend to corroborate what Douglas told Simmons in the hours and day after the crime and police questioning, but they generally lack more specific detail.

Sherri Jordan testified that Douglas told her the police pressured her to pick Plaintiff, ECF No. 157-6 at 60–62, and that Douglas felt forced to pick Plaintiff, Jordan Dep. 31.13–17, ECF 157-43 at 10. But Douglas only began telling her this in 2010, 32 years after the fact, and Jordan relates no details of how exactly police tried to pressure Douglas.

Richardson related that Douglas told him the police told her if she picked Plaintiff "it would be over with and she could go on with her life," ECF No. 157-6 at 95, and "the detective, when they did the lineup, had told her that all she had to do was pick Strickland out and they'd be done with it," Richardson Dep. 111.17–19, ECF No. 157-68. But he does not say how long after the events she told him this.

Douglas's mother related that Douglas told her on three different occasions sometime after the trial that the police rushed her to pick Plaintiff, saying "that's the one, that's the one right there," but gives no other details. S. Douglas Dep. 23.8–24.1, ECF No. 157-20.

Douglas's childhood friend Wesson related that Douglas told him in 2004–2005 that the lineup was suggestive, Wesson Dep. 27.13, ECF No. 157-42, that an officer pointed to a picture of Plaintiff, *id.* 27.24–25, and that Douglas "still had pieces of Sherri's face in her hair" when she was at the police station, *id.* 38.10. He also related that Douglas told him she was threatened with perjury if she were to recant her trial testimony, ECF No. 157-6 at 105, and that officers "kind of kept their finger on" the photo of Plaintiff, Wesson Dep. 108.1–3.

And Douglas's coworker Maytubby related that Douglas told her she was "stressed to name someone" and was pressured by the police but gave no details. Nor did she relate when Douglas told her this, though the Court notes it likely had to be sometime between 1999 and 2012, ECF No. 157-6 at 36 (Douglas and Maytubby worked together between 1999 and 2012). *Id.* at 38.

Despite the family and friend relationships and some specificity of detail, the Court holds these statements are untrustworthy for Rule 807. The passage of time—decades (or unspecified) in every case—between the events and Douglas's statements diminishes their credibility. *See Bruguier*, 961 F.3d at 1033 (hearsay statement made nine months after events "not . . . particularly worthy of belief"); *United States v. Halk*, 634 F.3d 482, 489 (8th Cir. 2011) (hearsay statements proffered under Rule 807 "made over a year after" events had "diminish[ed] . . . credibility"). And the motivations for Douglas to misrepresent her identification of Plaintiff (remorse, psychological pain, attempt to manage her reputation), which were absent in her statements to Simmons immediately after the lineup, are more plausible years and decades after the fact. Moreover, these later statements are not "more probative" on the issue of police pressure than Douglas's statements to Simmons. *See* Rule 807(a)(2). Indeed, the seeming veracity of the statements depends largely on the earlier statements related by Simmons. But hearsay cannot be "bootstrapped" into admissibility by reliance on other evidence. *Stoney End of Horn*, 829 F.3d at 686.

Accordingly, these later statements are inadmissible.

**B. Purposes of the Rules of Evidence and the Interests of Justice**

Because the Court has held that only Douglas's statements to Simmons immediately after the lineup are trustworthy, the Court only addresses these statements under the purposes of the Rules of Evidence and the interests of justice.

The Rules of Evidence "should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." Fed. R. Evid. 102.

Rule 807 is restricted to extraordinary circumstances. This case provides them. The evidence of Plaintiff's innocence was strong enough to lead to his release from prison. The primary evidence tying Plaintiff to the crime was the testimony of Douglas, who allegedly told her sister immediately after identifying Plaintiff at the police station that she didn't know if it was Plaintiff and that the police told her whom to pick and would not let her leave until she picked Plaintiff. And Douglas later consistently recanted her testimony to many people. Nevertheless, Plaintiff spent 43 years in prison for a crime the office that prosecuted him and the court where he was convicted now say he did not commit. Now that his conviction has been set aside, he brings this § 1983 claim against the Officers whom he alleges fabricated Douglas's identification, which was the primary evidence that led to his prosecution and wrongful conviction. But Douglas died in 2015, and the detective who witnessed the lineup and signed the report died in 1978, ECF Nos. 157-54, 157-70 at 13 n.24, months before Plaintiff's trial and conviction. Only Simmons is available to tell the jury what allegedly happened at the lineup—which helped doom Plaintiff to 43 years of wrongful incarceration—based on what Douglas allegedly told her immediately after it happened. Extraordinary circumstances like these are why Rule 807 exists. "[T]he purpose of

rules of evidence is to get at the truth[,] not to suppress it," *Woodward v. United States*, 185 F.2d 134, 137 (8th Cir. 1950), *rev'd on other grounds*, 341 U.S. 112 (1951). Admission of Douglas's statements to Simmons after the lineup furthers that purpose. It is for a jury to decide if Simmons is a credible witness to what her sister said.

Accordingly, Douglas's statements to Cecilia Simmons immediately after the lineup are admissible under Rule 807. Douglas's statements to police officers at the hospital the night of the crime and at the Tracy house the day after the crime and her statements to other family and friends in later years are inadmissible.

**b. Plaintiff's prior testimony is admissible.**

In Defendants' objections to Plaintiff's Statement of Facts ¶¶ 99a, 100–01, 104, 140–41, 144–45, 247, Defendants object that Plaintiff's statements in prior testimony were "self-serving" and therefore insufficient to raise a genuine dispute of material fact at summary judgment. *See* Defs.' Summ. J. Reply, ECF No. 158. In their opposition to Plaintiff's brief, however, they abandon that argument[16] and argue instead that Plaintiff has failed to offer a hearsay exception for the admission of his prior testimony. As noted above, because Plaintiff is available to testify at trial, the Court treats these prior sworn statements as it would depositions, affidavits, or declarations for purposes of summary judgment. *RSBI Aerospace, Inc.*, 49 F.3d at 403. Plaintiff

[16] And rightly so. As this Court has noted, "the testimony a party seeks to offer on its behalf is almost always self-serving, and the Federal Rules of Evidence do not prohibit a party from offering self-serving evidence." *Gdovin v. Cummins Cent. Power, LLC*, No. 3:10-CV-0150-DGK, 2012 WL 1111848, at *3 (W.D. Mo. Apr. 2, 2012). And the Eighth Circuit has repeatedly made this clear. *See, e.g.*, *Hall v. Higgins*, 77 F.4th 1171, 1182 (8th Cir. 2023) ("[A] party's own testimony is often self-serving, and that alone is not grounds for disregarding it entirely." (citation omitted); *Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015) ("[T]he self-serving nature of . . . deposition testimony [does not] serve to make such evidence inherently infirm. As such, we generally do not discount such evidence at the summary judgment stage."). Only "sham" affidavits, which are drawn up solely to manufacture disputes of fact when none otherwise exists, may be excluded as "self-serving." *See Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020) ("It is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment. . . . An affidavit is a sham affidavit if it contradicts prior testimony or is a sudden and unexplained revision of testimony that creates an issue of fact where none existed before." ( citations and alteration omitted)).

represents to the Court that he will testify in this case as he did in prior cases. *See* ECF No. 177 at 29 n.18. If he offers contradictory testimony, Defendants can impeach him with his prior testimony, Fed. R. Evid. 801(d)(1)(A), just as they seek to do with his prior filings, ECF No. 178 at 23–24.

Additionally, Plaintiff suggests—though he doesn't raise it directly—that some of his prior testimony is admissible as prior consistent statements, Fed. R. Evid. 801(d)(1)(b). *See* ECF No. 177 at 30–31 (referring to Plaintiff's consistent testimony in prior proceedings about Officers' alleged fabrication of inculpatory statements). To the extent Defendants argue they "have been accused of misconduct for the first time in 40 years," ECF No. 178 at 29, with the potential implication that Plaintiff's "overhaul[ of] his entire theory," *id.* at 25, is essentially a "recent[] fabricat[ion]," Fed. R. Evid. 801(d)(1)(b), Plaintiff's prior testimony rebutting the claim that he has never accused the Officers of misconduct is not hearsay under Rule 801(d)(1)(b).[17]

Plaintiff's prior testimony is therefore admissible at summary judgment.

**c. The basis for the Jackson County Circuit Court's order vacating Plaintiff's conviction is admissible.**

The parties agree that the Court may take judicial notice of Judge Welsh's order vacating Plaintiff's conviction and the Jackson County Prosecutor's Office's ("JCPO") dismissal of charges. However, they dispute the admissibility of the basic facts underlying the vacatur. Plaintiff argues judicial notice of the vacatur without notice of its factual reasons would be highly prejudicial because it could lead the jury to wonder if the conviction was overturned on a technicality rather than on the basis of Plaintiff's actual innocence. Defendants argue the factual

[17] Even taking Defendants' general assertion about misconduct as referring only to the allegations of pressure on Douglas to identify Plaintiff, the assertion that Plaintiff has never alleged anything like this before is not supported by the record. *See* 2021 Habeas Petition ¶¶ 235, 239, ECF No. 148-1 at 28–29 ("According to Wright, Douglas told everyone that 'the detectives told her what to say . . . .'" "[Douglas's mother] Senoria further stated . . . Douglas confided in Senoria that 'she was told by detectives that [Plaintiff] was the one she should pick.'").

findings of the vacatur order are inadmissible hearsay and that only the vacatur and dismissal of charges (i.e., favorable termination of the prosecution) themselves are relevant, while evidence of Plaintiff's innocence is not.

Generally, "[j]udicial notice of another court's opinion takes notice of the existence of the opinion, which is not subject to reasonable dispute over its authenticity, but not of the facts summarized in the opinion." *McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) (citation and internal quotation marks omitted). "A court's prior judgment or ruling is inadmissible hearsay if it is offered to prove the truth of the matter asserted. Only judicial rulings that are offered for a different purpose . . . are admissible." *UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 864 (8th Cir. 2017).

Plaintiff's conviction was vacated after the JCPO filed a motion to vacate with the Jackson County Circuit Court pursuant to Mo. Rev. Stat. § 547.031, which states

> [a] prosecuting or circuit attorney, in the jurisdiction in which charges were filed, may file a motion to vacate or set aside the judgment at any time if he or she has information that the convicted person may be innocent or may have been erroneously convicted. . . . The court shall grant the motion . . . where the court finds that there is clear and convincing evidence of actual innocence or constitutional error at the original trial or plea that undermines the confidence in the judgment.

Section 547.031.1, 3. The Jackson County Circuit Court's vacatur was based on clear and convincing evidence of Plaintiff's actual innocence. Vacatur Order at 13–14, ECF No. 157-2.

From what the Court can tell, Plaintiff seeks to offer the vacatur order and its basis—clear and convincing evidence of Plaintiff's innocence—not for the truth of Plaintiff's innocence, or for any other finding by that court, but "to complete the story of the prosecution" and eventual vacatur. That is, Plaintiff offers the order to explain why the state of Missouri released him from prison after 43 years as background information to his current case, not to prove that he is innocent.

This is a legitimate non-hearsay use of the vacatur order. Parties may provide background information to give context to actions or events through out-of-court statements, because providing context does not require that the statements be true. *See United States v. Running Horse*, 175 F.3d 635, 638 (8th Cir. 1999) (affirming admission of out-of-court statements as "background information to assist the jury in understanding the origin of [an] investigation"); *Restivo*, 846 F.3d at 559 (2d Cir. 2017) ("Plaintiffs were not required to prove their innocence to win on their [§ 1983] claims at trial. However, the evidence of their innocence provides an important backdrop for their claims at trial."). Moreover, a court may take judicial notice that another court made a particular finding without bringing it into evidence for its truth. *See Holloway v. Lockhart*, 813 F.2d 874, 878–79 (8th Cir. 1987) ("The fact that the judge *made* [a particular] finding . . . is a judicially noticeable fact . . . .") (emphasis in the original).

Accordingly, the Court takes judicial notice that the Jackson County Circuit Court made a finding of Plaintiff's actual innocence and thus vacated Plaintiff's conviction under Mo. Rev. Stat. § 547.031. This explains the basis for the state of Missouri's release of a man it had incarcerated for murder for 43 years and gives context to the origins of Plaintiff's case. These uses do not depend on the truth of the Jackson County Circuit Court's finding, and indeed, Plaintiff does not have to prove his innocence to prevail on any of his claims here. In light of this notice of the Court, Plaintiff may not use the vacatur order's findings at summary judgment for their truth to show a genuine dispute of material fact, because such a use would be inadmissible hearsay. If the Court admits the vacatur order at trial, it will give the jury a limiting instruction. *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions.

Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters. In those cases, as in all cases, juries are presumed to follow the court's instructions.").

**d. The factual findings and fact-based opinions and conclusions of the JCPO's Investigation Findings Report and Nelson memos are admissible.**

The parties agree that the JCPO's Investigation Findings Report ("the Report"), ECF No 157-1, is admissible under Rule 803(8), the public-records hearsay exception. The Court agrees. Rule 803(8) admits "a record . . . of a public office if it sets out . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8). However, Plaintiff seeks to limit admission to the aspects of the Report that are within the scope of the investigation—what the JCPO was "legally authorized" to investigate—namely, his innocence. Defendants argue the entire document should be admitted under the doctrine of completeness.

"If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." Fed. R. Evid. 106; *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172, (1988) ("[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible under Rules 401 and 402.").

To the extent Defendants argue that the doctrine of completeness always requires the admission of whole documents, they are mistaken. It is only the portions "that in fairness ought to be considered at the same time" that the adverse party may require. Or, as the Supreme Court explained, it is the portions of the document necessary to avert "misunderstanding or distortion" that are admissible. Rule 106 does not mandate the admission of whole documents by itself.

But there is another problem with the admissibility of the whole Report. Much of the Report consists of hearsay within hearsay. Hearsay within hearsay is only admissible if each level of hearsay is subject to a hearsay exception. Fed. R. Evid. 805; *see Kelley v. Boosalis*, No. 018CV00868SRNTNL, 2018 WL 6040436, at *10 (D. Minn. Nov. 19, 2018) (excluding multiple hearsay from public records offered under Rule 803(8)); *Ribeiro v. Baby Trend, Inc.*, No. 8:12CV204, 2017 WL 1393088, at *12 (D. Neb. Apr. 17, 2017) ("An investigative agency report generally contains double hearsay, the report itself, and what a witness told the investigator. The report is inadmissible unless each level of hearsay falls within an exception to the hearsay rule." (citing *United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006)).

The parties do not suggest exceptions for the multiple hearsay in the Report, and the Court will not speculate. In any event, "Rule 803(8)(C) makes admissible [] 'factual findings resulting from an investigation,'" *Taylor*, 462 F.3d at 1026, and "opinion and conclusions" based on those facts, *Beech Aerospace Services, Inc.*, 488 U.S. at 162 ("[F]actually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C).").

Accordingly, the factual findings and fact-based opinions and conclusions of the Report and those parts of the report (even if hearsay) that in fairness ought to be considered at the same time or are necessary to avert misunderstanding or distortion are admissible. But multiple hearsay that is not necessary for fairness or understanding is not admissible simply because it appears in the Report.

Relatedly, the parties contest the admissibility of memos Dan Nelson wrote summarizing the JCPO's findings. *See* ECF No. 157-70.[18] Defendants assert these memos are admissible as public records.[19] Plaintiff disagrees.

The memos, like the Report, whose substance they anticipate, are admissible as public records under Rule 803(8). Plaintiff's argument to the contrary—that they are the reports of an individual and not the office and therefore not public records—is unavailing. "The public records and reports exception rests on 'the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record.'" *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir. 1983) (quoting Fed R. Evid. 803(8), Advisory Committee's Note). That is, the records and statements of public offices are typically written by individual public officials as officials, who are presumed, in their official capacity, to record the work of the office faithfully.[20] And, as explained above, the fact that the memos contain opinions and conclusions does not remove them from the public-records exception's scope. *Beech Aerospace Services, Inc.*, 488 U.S. at 162. The memo is a "record . . . of a public office" that "sets out . . . factual findings from a legally authorized investigation." They were written by a public official, who is presumed to have performed his duty properly, and their conclusions and opinions are "factually based." Plaintiff must show the memos are untrustworthy to exclude them. *Kehm,*

---

[18] Nelson issued a "Conviction Review Summary" on December 21, 2020, ECF No. 157-70, and a "Conviction Review" on May 10, 2021, ECF No. 157-71. He sent both documents to the JCPO Conviction Integrity Unit. The second memo contains the same information and analysis as the first and adds additional evidence related to Plaintiff's innocence.

[19] The Court addresses Defendants' adoptive-admissions argument below. *See infra* Section IV.c.

[20] Plaintiff's reliance on *Patterson v. Cent. Mills, Inc.*, 64 F. App'x 457, 462 (6th Cir. 2003) ("The public records exception . . . extends only to opinions of the agency or public office itself, not to those of its individual members contained within the records."), is misplaced. The statements the Sixth Circuit held were not admissible under Rule 803(8) were an individual commissioner's statements, "as a mother, I hope parents will wisely choose the safer alternative of tight-fitting cotton sleepwear" and "it is imperative that a visible point of purchase label of some type be on the garment or inside the garment wrapper." *Id.* There is nothing in the Nelson memo comparable to such individual, non-official statements.

724 F.2d at 618 ("The burden is on the party opposing admission to prove the report's untrustworthiness."). He has not done so.

Accordingly, as with the Report, the memos' factual findings and fact-based opinions and conclusions and those parts of the memos (even if hearsay) that in fairness ought to be considered at the same time or are necessary to avert misunderstanding or distortion are admissible. Multiple hearsay that is not necessary for fairness or understanding is not.

Plaintiff's concern to clarify the limited scope of the investigation—his innocence, not police misconduct—may be addressed through a limiting instruction to the jury.

**e. Vincent Bell's plea allocution is admissible.**

Plaintiff argues Bell's plea allocution is admissible as "a statement in" an ancient document (the plea hearing transcript) under Rule 803(16). Defendants argue Bell's statements are hearsay within hearsay, Fed. R. Evid. 805, and the ancient documents exception therefore does not extend to them.

Rule 803(16) states, "[a] statement in a document that was prepared before January 1, 1998, and whose authenticity is established" is not excluded by the rule against hearsay. Defendants do not challenge the authenticity of the document containing Bell's plea allocution, so the Court only addresses the hearsay within hearsay issue.[21]

The Eighth Circuit has not ruled on whether Rule 805's hearsay within hearsay analysis applies to the ancient-documents exception, and cases from other circuits are mixed. *Compare Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1081 (9th Cir. 2019) ("[A]n ancient document . . . may contain multiple levels of hearsay."), *with Langbord v. United States*

[21] *See* 28 U.S.C. § 753(b) ("The transcript in any case certified by the reporter or other individual designated to produce the record shall be deemed prima facie a correct statement of the testimony taken and proceedings had.").

*Department of Treasury*, 832 F.3d 170, 189 (3d Cir. 2016) ("In our view, stronger precedent supports the application of Rule 805 to ancient documents.").

The language of the rule—"a statement in a document that was prepared before January 1, 1998"—indicates that any statement, whether multiple hearsay or not, is not excluded by the rule against hearsay if it is in an ancient document. The reliability of such statements under the rule is based on the authenticity of the document and the passage of time, that is, on the statements' remoteness from the current controversy. *See* Fed. R. Evid. 803(16), Advisory Committee's Note (noting "danger of mistake is minimized by authentication requirements, and age affords assurance that the writing antedates the present controversy"). Moreover, the one case cited by the Advisory Committee to support the rule, *Dallas County v. Commercial Union Assur. Co.*, 286 F.2d 388 (5th Cir. 1961), admitted a 58-year-old newspaper article that almost certainly contained multiple hearsay. *See* Wright & Miller, 30B Fed. Prac. & Proc. Evid. § 6935 (2026 ed.) ("[I]t is likely that the newspaper account admitted . . . consisted of a reporter's assertions of what he had been told by others [about a lightning strike]—i.e., multiple hearsay. Yet there is no suggestion that the underlying levels of hearsay . . . fit within a separate hearsay exception. If the *Dallas County* case presents an illustration of the proper workings of the ancient documents exception, it suggests that hearsay within hearsay analysis is not warranted." (citing *Dallas County*, 286 F.2d at 390)).

Accordingly, because Bell's statements during his plea allocution are in a document that was prepared before January 1, 1998, they come under the plain meaning of Rule 803(16)[22] and are therefore admissible under the ancient-documents exception. Questions about the content of

[22] *See* Wight & Miller, 30B Fed. Prac. & Proc. Evid. § 6935 ("The ancient documents exception is premised solely on age. Thus, it is significant that every statement within an ancient document can claim the same or greater age-related imprimatur. This leads to the conclusion that courts should take the federal ancient records hearsay exception's text at face value. Each layer of hearsay within an ancient document can qualify for admission under the exception if the document 'was prepared before January 1, 1998.'").

the allocution go to their weight with the jury, not their admissibility. Plaintiff's other arguments for admissibility are unpersuasive for the reasons stated in Defendants' opposition brief, ECF No. 180 at 37–40.

**f. Newspaper articles are admissible.**

Plaintiff relies on various newspaper articles that reported on the murders in the days immediately following. He argues that most are not hearsay, because he does not offer them for their truth but to establish what was reported about the murders and thus what he could have known about them from public sources. This is relevant to Plaintiff's innocence, because it shows that Plaintiff could have had knowledge about the murders without having committed them. As to the one article offered for its truth, ECF 157-32 (reporting that "police issued a pickup order for two black men by name late Tuesday"), Plaintiff argues it is admissible as an ancient document under Rule 803(16) and is probative of his contention that Douglas did not mention his name the night of the murder, contrary to the Officers' testimony. Defendant disputes Plaintiff's claim that he offers the first set of articles to show what was reported—and therefore what he could have known from public sources—and not for their truth, arguing that he offers them to confirm his innocence, "that is, for their truth." Additionally, they argue Plaintiff's knowledge is immaterial. As to the article that reported on the pickup notice, Defendants argue it is irrelevant and not probative enough to overcome the risk of confusion. They also argue the Court should exclude it because the article is proof only of the absence of information.

Defendant's arguments concerning the first set of articles are unavailing. The articles do not assert that Plaintiff is innocent, so Plaintiff cannot offer them as true assertions of his innocence. Rather, he offers them as evidence of his innocence in that they show he could have known details about the murders without having been involved in them. This is a straightforward

non-hearsay use. *See United States v. Miller*, No. CR 20-232 (JRT/DTS), 2024 WL 2218446, at *5–6 (D. Minn. May 15, 2024) (holding introduction of consumer complaints to prove notice or knowledge of the complaints rather than the truth of the matter asserted in the complaints was not hearsay); Wright & Miller, 30B Fed. Prac. & Proc. Evid. § 6719 (2026 ed.) ("The party offering [an out-of-court] statement can use th[e] theory . . . that the statement provoked some relevant . . . knowledge . . . on the part of a person who heard it . . . to overcome a hearsay objection. Assuming the statement is, in fact, relevant to show its effect on a listener, and offered for that purpose, the statement is not hearsay.").

Defendants' conclusory statements against the one article being offered for its truth fare no better. Defendants do not address the ancient-documents exception, which, the Court holds, applies to the newspaper articles for the reasons explained above concerning Bell's plea allocution. Moreover, Defendants simply assert without argument that the article is irrelevant and should also be excluded under Rule 403 because of the risk of confusion. Defendants' absence-of-information argument also fails, and the case they cite in support is readily distinguishable. *See United States v. Big D Enters., Inc.*, 184 F.3d 924, 934–35 (8th Cir. 1999) (finding that absence of response to a government pamphlet seeking information about discrimination did not prove an absence of discrimination).

The newspaper articles are admissible and will not be excluded under Rule 403 at this time.

**g. Prosecutor notes are admissible.**

Plaintiff relies on handwritten notes alleged to be taken by a JCPO prosecutor or prosecutors during meetings with two of the Officers, Parker and Gilmer, who responded to the murder scene in 1978. *See* ECF No. 157, Pl.'s SOF ¶ 169. Defendants argue the notes are inadmissible at summary judgment because they are not authenticated, and that, even if they were,

they are inadmissible hearsay. Plaintiff argues they clear the low bar for authentication and that they are subject to the ancient-documents and business-records exceptions to the rule against hearsay. *See* Fed. R. Evid. 803(16) and 803(6).

For the Court to consider evidence at summary judgment, the proponent must authenticate the evidence or show how the evidence could be authenticated. *Boyd v. Lowe's Companies, Inc.*, No. 4:21-CV-00417-DGK, 2023 WL 2507593, at *11 (W.D. Mo. Mar. 14, 2023). To authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(a). "This may be done with circumstantial evidence." *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010). The authentication of ancient documents looks to whether the document "is in a condition that creates no suspicion about its authenticity" and "was in a place where, if authentic, it would likely be." Fed. R. Evid. 901(b)(8)(A)–(B).

The notes were produced by the JCPO at discovery as "prosecutor notes" from the 1979 trial boxes. There is nothing intrinsic to the notes that calls their authenticity into question. *See TIG Ins. Co. v. Missionary Oblates of Mary Immaculate*, No. 20-CV-2261 (ECT/JFD), 2024 WL 687808, at *2 (D. Minn. Feb. 20, 2024) (noting "erasures, missing parts, misspellings, changes in handwriting, unusual format, anachronistic content, and a freshness of appearance that belies ages" as matters intrinsic to a document that could raise suspicions of inauthenticity). They contain the kind of information one would expect from a pretrial meeting in a prosecutor's office (e.g., "to-do" list, details of and questions about the Officers' investigation, etc.), and they were found in a place where authentic prosecutor notes would likely be: in the original trial boxes with other documents from the investigation and trial. Plaintiff indicates that he will lay a proper foundation

for the notes at trial through the JCPO, who produced the notes in the first place. This is sufficient evidence for the Court to find that the notes are what Plaintiff says they are.[23]

As to hearsay, the parties agree that the notes are hearsay and only disagree about whether an exception applies. Plaintiff argues the notes are subject to the ancient-documents exception. Defendants disagree.

The authenticity of the notes is established for purposes of summary judgment, so the only question is whether the documents were prepared before January 1, 1998. *See* Fed. R. Evid. 803(16). Plaintiff argues the notes' location in the 1979 trial boxes establishes their date. Defendants argue that nothing on the notes' face indicates they were prepared before January 1, 1998: one note is undated and the other has a partially obscured date (apparently April 25, 1978, the date of the murders and so presumably not the date of the document).

In this situation, establishing the authenticity of the notes also establishes the date. Plaintiff claims the notes are prosecutor's notes from pretrial meetings between the JCPO and Officers Gilmer and Parker. If they are authentic—and there is sufficient evidence they are—then they were written sometime before Plaintiff's conviction in 1979. As such, the notes are ancient documents.

Plaintiff also argues the notes are admissible as business records under Rule 803(6). Defendants disagree. A record of "a regularly conducted activity" "is admissible under Rule 803(6) if 'made at or near the time [of the events] by . . . a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business

[23] Defendants' reliance on *Stuart v. Gen. Motors Corp.* is misplaced, if not misleading. In Stuart, the Eighth Circuit did indeed refuse to consider an "unattributed" "collection of handwritten notes." *See* ECF No. 180 at 40. But the reason goes beyond the fact that they were unattributed and handwritten. As the court explained, the proponent "fail[ed] to offer any independent evidence authenticating these notes. Consequently, they will not be considered by the Court." 217 F.3d 621, 636 n.20 (8th Cir. 2000). Unlike the proponent in *Stuart*, Plaintiff offers independent authenticating evidence here.

activity to make the . . . record,' unless other circumstances suggest a 'lack of trustworthiness.'" *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061 (8th Cir. 1995) (quoting Fed. R. Evid. 803(6) and admitting accountant's notes from meetings with clients).

The notes also satisfy Rule 803(6). There is sufficient evidence that they are authentic prosecutor's notes from pretrial meetings between Officers Gilmer and Parker and the JCPO. Such meetings are a regular part of criminal prosecution, and Plaintiff represents to the Court that he will lay a proper foundation for the notes through the JCPO at trial, which would have to include testimony that the JCPO regularly keeps records of pretrial meetings with investigators.

Thus, the notes are admissible under either exception. But insofar as the notes contain a statement attributed to Douglas, the Court must address whether the documents contain inadmissible hearsay within hearsay as to the business-records exception.[24] *See* Fed. R. Evid. 805.

Plaintiff claims to offer the prosecutor notes as evidence that Officers Parker and Gilmer communicated with the JCPO about the case. ECF No. 177 at 31. That is a non-hearsay use. As to the statements contained within the notes, Plaintiff used the notes in his SOF to assert "Gilmer and Parker both reported to the prosecutor that, while they were speaking to Cynthia Douglas, the only living victim, at the scene immediately after the crime, Douglas volunteered what they understood to be the moniker 'Naudi' as one of the perpetrators," and cites, among other sources, Parker Pros. Notes, ECF No. 157-49 ("notes from JCPO file about questions for Parker"), and Gilmer Pros. Notes, ECF No. 157-48 ("notes from JCPO file about meeting with Gilmer"). First, the fact asserts that Gilmer and Parker made a statement to the prosecutor. Gilmer and Parker are party opponents, so their statements are not hearsay, Fed R. Evid. 801(d)(2)(a). At the next potential level of hearsay, the assertion to the JCPO that Douglas volunteered the name "Naudi"

[24] The Court addressed the issue of multiple hearsay in ancient documents above. *See supra* Section III.e.

(*i.e.*, Plaintiff) immediately after the crime is a statement whose truth Plaintiff explicitly contests. He is not offering it for its truth, so it is not hearsay.

Accordingly, the notes and the statement reported are admissible.

**h. Shawn Pinder's expert report is admissible.**

Courts routinely allow parties to rely on sworn expert reports at summary judgment. *See, e.g.*, *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 825–26 (8th Cir. 2009). Plaintiff asserts the expert evidence will be presented through expert testimony at trial. Plaintiff may therefore rely on the expert reports at summary judgment.

**i. The Edlund deposition is admissible.**

Plaintiff relies on Officer Edlund's testimony regarding police misconduct he observed at the KCPD in the 1970s to rebut Defendants' claim that misconduct such as threats or suggestive lineup techniques was impermissible and did not happen at the KCPD at the time Plaintiff was arrested. *See* ECF No. 146, Defs.' SOF ¶ 316, ¶¶ 318–20. Defendants argue the testimony lacks probative value and presents a high risk of prejudice and should therefore be excluded under Rule 403.

As explained above, the Court will not exclude evidence under Rule 403 at summary judgment. Beyond this, the Court rules that, insofar as Defendants have put at issue the range of permissible and impermissible police practices—and have testified that they never saw the kind of police misconduct Plaintiff alleges—as evidence that they did not engage in misconduct, they have opened the door for Plaintiff to offer rebuttal evidence concerning the range of practices at the KCPD at the time of his arrest and prosecution.

Accordingly, the Edlund deposition is admissible for rebuttal purposes. If the Court admits Edlund's testimony at trial, it will give the jury a limiting instruction.

**j. Hearing and deposition transcripts from collateral proceedings and related declarations**

Defendants object to this evidence as inadmissible hearsay. Plaintiff represents that every Declarant upon whom he relies for evidence from the collateral proceedings is available to testify at trial.[25]

As the Court has already said, even when an opposing party "did not participate in the taking of the statement, a sworn statement taken under oath is at least as reliable as an affidavit for the purposes of Rule 56(c)." *RSBI Aerospace, Inc.*, 49 F.3d at 403. And the availability of declarants to testify about the substance of their own sworn hearsay statements makes the substantive evidence admissible. *See UPS Ground Freight*, 683 F.3d at 1294 (11th Cir. 2012). As such, hearsay statements that convey the personal knowledge of a declarant who is available to testify at trial are admissible and may be relied upon at summary judgment. However, as the Court explained above in its analysis of Cynthia Douglas's statements—and as a general principle—the availability of declarants to testify does not necessarily cure the multiple layers of hearsay that may be contained in their declarations. Accordingly, Plaintiff may not rely on multiple hearsay not subject to an exception in his use of statements from collateral proceedings.

**k. The JCPO's motion to set aside is inadmissible as substantive evidence.**

The parties have not addressed the JCPO's motion to set aside Plaintiff's conviction, even though the Court noted it in its Order for supplemental briefing. Plaintiff relies on it for the JCPO's conclusions concerning the infirmity of his conviction and his actual innocence. This is essentially the evidence found in the JCPO's Report, which the parties agree is admissible as a

[25] The parties do not address the declaration of Jean Peters Baker about the JCPO's findings, ECF No. 157-75, even though the Court noted it in its Order for supplemental briefing. The Court presumes Baker would be available to testify about the substance of her declaration. And, insofar as Defendants seek to offer the vacatur proceedings as evidence that police misconduct was not the cause of Strickland's wrongful conviction, Baker's testimony that the JCPO's investigation did not address police misconduct, *id.* ¶ 12, is relevant and probative.

public record. A motion is not, however, a public record of administrative findings but rather an argument presented to a court. And because Plaintiff offers no other hearsay exception, the Court excludes the content of the JCPO's motion to set aside as inadmissible hearsay. However, the Court takes judicial notice that the JCPO filed the motion because it concluded that Plaintiff was actually innocent, as represented in the admissible Report.

## IV. Defendants' Evidence

As with Plaintiff's evidence, the Court will not exclude any of Defendants' evidence under Rule 403 at summary judgment. Accordingly, the Court only rules here on the hearsay issues raised by Defendants' evidence.

### a. Plaintiff's prior court filings are admissible as opposing-party statements.

An opposing party's statement that is offered against him is not hearsay. Rule 801(d)(2)(A). An opposing party's prior filings in a court can be offered as opposing-party statements under Rule 801(d)(2)(A). *See Arnold v. Groose*, 109 F.3d 1292, 1296 (8th Cir. 1997) (holding opposing party's prior pleadings and motions from another case "were, for evidentiary purposes, admissions by a party opponent under Federal Rule of Evidence 801(d)(2)(A).").

Plaintiff agrees that his prior filings are opposing-party statements and not inadmissible on hearsay grounds. He only contends that the Court must exclude them under Rule 403 because they lack probative value and would confuse the jury. As noted above, the Court will not exclude them on that basis at this time. If the Court admits them at trial, it will give the jury a limiting instruction.

### b. Statements by Plaintiff's counsel

"A statement by a party's attorney can be admissible as an admission by a party opponent if it is relevant." *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 996 (8th Cir. 2008); *see also United States v. Ojala*, 544 F.2d 940, 946 (8th Cir. 1976) (admitting statements made in

an "unequivocal manner by one who was acting as [an opposing party's] attorney at the time, and . . . [that] referred to a matter within the scope of the attorney's authority" under Rule 801(d)(2)).

**1. Plaintiff's counsel's closing argument from the vacatur hearing is admissible as an opposing-party statement.**

Defendants rely on Plaintiff's counsel's closing argument from the vacatur hearing. *See, e.g.*, ECF No. 148, Ds' SOF ¶¶ 286–92. There, in the context of Plaintiff's attempt to convince the Jackson County Circuit Court to set aside his conviction, his attorney made arguments on his behalf concerning the unreliability of Douglas's identification of him, which was at the heart of his conviction. These statements were relevant to the proceeding and clearly within the scope of the attorney's authority. They are admissible as an opposing-party statement.

**2. Plaintiff's counsel's statements at the 2021 JCPO press conference are not admissible as opposing-party statements.**

Defendants also rely on Plaintiff's counsel's statements at a 2021 JCPO press conference held the day Plaintiff filed his 2021 habeas petition. *See, e.g.*, ECF No. 148, Ds' SOF ¶¶ 240, 243. Plaintiff was not present at the press conference, because he was still incarcerated, and he testified at his 2024 deposition that he did not know his attorney spoke at the press conference or even that it happened. Pl.'s Dep. at 112.23–113.15, ECF No. 148-43.

While Plaintiff's counsel's statements can be admissible as Plaintiff's own, the statement must be within the scope of the attorney's authority or agency for it to be attributable to Plaintiff through Rule 801(d)(2)(C) or (D) (statement "(C) made by a person whom the party authorized to make a statement on the subject; . . . (D) made by the party's agent or employee on a matter within the scope of that relationship and while it existed"). More particularly, "an attorney does not have authority to make an out-of-court admission for his client in all instances, [but] he does have

authority to make admissions which are directly related to the management of litigation." *Hanson v. Waller*, 888 F.2d 806, 814 (11th Cir. 1989).

Speaking at a press conference is not typically related to the management of litigation. Indeed, a number of courts have rejected claims for attorney's fees for media-related activities of counsel, because "the legitimate goals of litigation are almost always attained in a courtroom, not in the media," *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169 (4th Cir.1994).[26] This is not to say that a client who directs his attorney to hold a press conference and say certain things about his case would not be bound by the attorney's statements. It is to say, however, that an attorney's statements at a press conference do not necessarily bind the client, because a press conference is not a means of directly managing litigation, as opposed to court filings, arguments at trial, etc. And where, as here, a client did not even know about the press conference, it is unreasonable to automatically attribute to the client an attorney's statements to reporters. While it may not be "inevitabl[e]" that a party would always know the contents of his agent's statements, "knowledge of contents [is] ordinarily . . . essential." Rule 801(d)(2)(B), Advisory Committee's Notes. Because the statements to the media were not automatically within the scope of the attorney's authority or agency, they are not generally attributable to Plaintiff under Rule 801(d)(2)(B).

Defendants did present specific statements to Plaintiff for his adoption at his deposition. Under Rule 801(d)(2)(B), an adoptive admission "is [a statement] the party manifested that it adopted or believed to be true." "[I]n determining whether adoption of a statement has occurred, an examination must be conducted into the surrounding circumstances to see whether those

[26] *See also Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir. 1995) (following *Rum Creek* and disallowing attorney's fees for public relations); *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993) (affirming disallowance of attorney's fees for press conferences); *Greater Los Angeles Council on Deafness v. Community Television of S. Cal.*, 813 F.2d 217, 221 (9th Cir.1987) (affirming rejection of attorney's fees for attorney's publicity work); *Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir.1986) (denying attorney's fees for time spent on publicity about case).

circumstances indicate approval of the statement." *United States v. Missouri*, 535 F.3d 844, 852 (8th Cir. 2008). "Adoption or acquiescence may be manifested in any appropriate manner. . . . The decision in each case calls for an evaluation in terms of probable human behavior." Fed. R. Evid. 801(d)(2)(B), Advisory Committee's Notes.

The statements Defendants presented and Plaintiff's replies are the following:

> Q. [Plaintiff's attorney] Ms. Bushnell said it was "Only after a friend had heard the description that Cynthia Douglas provided and suggested that the description could be Kevin Strickland that she later then made an identification. Do you agree with that statement that your lawyer made?
>
> A. I don't know. I don't know.
>
> Q. You don't know?
>
> A. No, I don't know if I agree with it or not. It was so extensive.
>
> . . .
>
> A. I didn't hear the press conference.
>
> Q. I'm reading you the statement. Do you agree with the statement?
>
> A. I don't know if I do or don't.

Pl. Dep. 114.1–22, ECF No. 148-43.

> Q. Ms. Bushnell then states "It's not that it's necessarily coercion but that things seep into memory or are suggested, they become memory in different ways." Do you agree with that statement?
>
> A. Yes.

Pl. Dep. 115.16–21.

Plaintiff stated he did not know if he agreed with his attorney's statements at the press conference. He did not hear it, and he did not know if he agreed with some of the statements Defendants read to him at the deposition. And his one apparent adoption is ambiguous. The statement has multiple parts—"not . . . necessarily coercion," "things seep into your memory," "or

are suggested," etc.—and it is not clear what Plaintiff was agreeing to. And Plaintiff's counsel appropriately objected to the form of the question during the deposition. Pl. Dep. 115.20.

The surrounding circumstances do not show that Plaintiff adopted his attorney's statements at the press conference. Accordingly, they are not attributable to him and are inadmissible.

**c. JCPO Documents**

Defendants rely on (1) the JCPO's Report; (2) the JCPO's Conviction Review Summary (Nelson memo); (3) the JCPO's press conference about the case; and (4) the JCPO's motion to set aside the conviction. Defendants argue these are admissible as public records under Rule 803(8) and as adoptive admissions under Rule 801(d)(2)(B). Plaintiff agrees that the findings, opinions, and conclusions of the JCPO's investigation are admissible public records, but he seeks to limit their use to "what the JCPO was legally authorized to investigate: Plaintiff's innocence." ECF No. 179 at 8. Defendants reply that the doctrine of completeness requires admission of whole documents. While the Court has already addressed the Report and memo in general, it considers here specific adoptive admissions alleged by Defendants.

"A record or statement of a public office" is excepted from the rule against hearsay "if it sets out a matter observed while under a legal duty to report . . . or . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(ii)–(iii). As noted above, Rule 106's doctrine of completeness provides, "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." Thus, "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible under Rules 401 and 402." *Beech Aircraft Corp*, 488 U.S. at 172.

As explained above, the doctrine of completeness does not always require the admission of whole documents. The adverse party may only require the admission of the portions "that in fairness ought to be considered at the same time" or are necessary to avert "misunderstanding or distortion." Rule 106 does not mandate the admission of whole documents by itself.

Defendants' argument as to adoptive admissions also sweeps too broadly. Under Rule 801(d)(2)(B), an adoptive admission "is [a statement] the party manifested that it adopted or believed to be true." "[I]n determining whether adoption of a statement has occurred, an examination must be conducted into the surrounding circumstances to see whether those circumstances indicate approval of the statement." *Missouri*, 535 F.3d at 852.

Defendants' point to Plaintiff's deposition in this case as evidence of his adoption of JCPO statements. However, the surrounding circumstances do not indicate that Plaintiff approved the statements Defendants offer, namely, statements of the JCPO supposedly indicating that their investigation did not uncover any evidence of police misconduct. Defendants repeatedly asked Plaintiff if he agreed that Cynthia Douglas did not allege police coercion (107.2–108.13), that the JCPO did not find police coercion after their "thorough" investigation (109.21–110.1), and that the Jackson County Circuit Court did not find coercion in the vacatur hearing (111.20–22).

Setting the substance of the JCPO and court findings and Douglas's allegations to one side and addressing only what Plaintiff approved and did not approve in those statements, Plaintiff generally resisted adopting statements contrary to his theory of police coercion.

Concerning the JCPO investigation:

> Q. [Defendants quoting JCPO Report]: "Our investigation is now complete, and my office has drafted a memorandum analyzing the evidence." Do you see that?
>
> A. Yes.
>
> Q. Did you agree with Ms. Baker's determinations in her investigation and review?

A. I would have to say yes.

Pl. Dep. 105.16–23, ECF No. 148-43. "Ms. Baker's determinations" is a vague term as used in this particular question, and Plaintiff had just said that he had never seen the document to which Defendants were referring, Pl. Dep. 104.8, and that he didn't remember reading it, Pl. Dep. 104.20. So, it is unclear what Plaintiff agreed to. His counsel objected to the form of the question. Pl. Dep. 105.22. It is clear from the context of the deposition as a whole, however, that Plaintiff agreed with the JCPO's innocence determination.

Continuing with the JCPO investigation:

> Q. [Defendants quoting JCPO Report]: "My office concludes that Douglas talked herself into this identification after hearing whispers from the Harris brothers." Do you see that?
>
> A. Yes.
>
> Q. Do you agree with that?
>
> A. With the assistance of the police.
>
> Q. So now it's with the assistance of the police?
>
> A. It always has been.
>
> Q. Okay. They don't say that here, do they—
>
> . . .
>
> A. No, I don't read that.

Pl. Dep. 108.8–109.2, ECF No. 148-43 at 28–29. This is not an adoptive admission. Plaintiff actively disagreed with the content of the report insofar as it does not say Douglas's identification of him was "with the assistance of the police."

Concerning Douglas's email to the Midwest Innocence Project (as included in the JCPO investigation):

Q. Does she say anything about being coerced in that email communication—

. . .

A. Not that word.

Q. What word then? If not that word, what word?

A. A couple of words when she said things weren't clear.

Q. And you're saying that "things weren't clear" is similar to "I was coerced by police to identify Keven Strickland?

A. Yes.

Pl. Dep. 107.2–17. Again, Plaintiff resists the conclusion that the investigation proved there was no coercion and asserts here that Douglas's email did allege coercion.

As to the Jackson County Circuit Court vacatur order (as based on the JCPO investigation):

Q. And there was no finding by the judge who released you of any police misconduct or coercion, do you agree with that?

A. Yes.

Q. Do you think Judge Welsh's order got it right?

. . .

A. Well, to release me, yes.

Q. Okay. Nowhere else?

A. I've never read the order.

Pl Dep. 111.20–112.8. The only thing Plaintiff adopts here is the Jackson County Circuit Court's decision to release him, and he explicitly says he had never read the order itself.

While Plaintiff may have acknowledged that the JCPO documents say what they say, the examples given here show that he has not adopted them as a whole and, more to the point, that he actively qualified or rejected them in certain places insofar as they did not agree with his theory of

coercion. The Court makes no determination about that theory. The Court simply rejects the argument that Plaintiff has somehow adopted the whole of the JCPO findings as his own simply because he has relied on its determination that Douglas misidentified him and that he is innocent. The surrounding circumstances cannot bear such a conclusion.

Accordingly, the JCPO statements Plaintiff uses directly in his filings and has otherwise specifically adopted are attributable to him and admissible as opposing-party statements. But the JCPO documents as a whole cannot be attributed to him simply because he cites portions of them. Defendants must show (1) specific adoption to invoke the party-opponent exclusion or (2) that other specific parts of specific JCPO documents are necessary for the sake of fairness or understanding to invoke the doctrine of completeness.

**d. The Court takes judicial notice of the Missouri Supreme Court opinion affirming Plaintiff's conviction on the issues that were before that court.**

Like the Jackson County Circuit Court's vacatur order, the parties agree that the Court may take judicial notice of the Missouri Supreme Court's 1980 opinion affirming Plaintiff's conviction but dispute the admissibility of the basic facts underlying the opinion. Defendant seeks to offer the Missouri Supreme Court's findings as proof that the record does not contain a genuine dispute of material fact, that is, evidence of police misconduct leading to Douglas's misidentification of Plaintiff. *See* ECF No. 148, Ds' SOF ¶ 202 (citing *State v. Strickland*, 609 S.W.2d 392, 396 (Mo. 1980) ("[T]he lineup was not unduly suggestive. . . . Once [Douglas] viewed [Strickland] in the lineup she could have determined that he was not the person actually present that night. The ability of Cynthia Douglas to observe defendant the night of the murders while he held a shotgun on her and her friends, provided an adequate independent source to insure reliability, and removed any possible suggestiveness connected with the pre-trial lineup.")). Defendants argue this use is merely to establish the "procedural history of this case" and ask the Court to take judicial notice

that the Missouri Supreme Court found no police misconduct. They further affirm that they do not intend to use this as affirmative evidence at trial. Plaintiff argues the Missouri Supreme Court's factual findings are inadmissible hearsay.

As explained above, "[j]udicial notice of another court's opinion takes notice of the existence of the opinion, which is not subject to reasonable dispute over its authenticity, but not of the facts summarized in the opinion." *McIvor*, 773 F.3d at 914 (citation and internal quotation marks omitted). "A court's prior judgment or ruling is inadmissible hearsay if it is offered to prove the truth of the matter asserted. Only judicial rulings that are offered for a different purpose . . . are admissible." *UnitedHealth Grp. Inc.*, 870 F.3d at 864.

Despite Defendants' stated intention to offer the Missouri Supreme Court opinion as "procedural history," they actually seek to use it—as they acknowledge—to show that there is no evidence of police misconduct. That is, they seek to use the Missouri Supreme Court's statement about the lineup (for example) for its truth, namely, that "the lineup was not unduly suggestive." That statement is inadmissible hearsay, *UnitedHealth Grp. Inc.*, 870 F.3d at 864, and Defendants may not use it as a fact (or to show an absence of fact) to support summary judgment.

In addition, unlike the Jackon County vacatur order, where a finding of innocence (in the absence of a constitutional violation) was required for granting the vacatur, the Missouri Supreme Court's conclusion about the lineup was not properly before that court, because Plaintiff had not advanced the argument that the lineup was unduly suggestive—raised at trial through a motion to suppress—on appeal. *Strickland*, 609 S.W.2d at 396. Nevertheless, the Missouri Supreme Court reached out to address it, but it was not the basis for, or necessary to, its decision. Therefore, Defendants are not entitled to include that "finding" of the Missouri Supreme Court to "complete the story" of the procedural history.

Accordingly, the Court takes judicial notice that the Missouri Supreme Court affirmed Plaintiff's conviction based on its findings on the issues that were properly before it,[27] and it is admissible on that basis.[28] To the extent Defendants seek to offer the statements about the lineup for their truth—i.e., as evidence that there was no police misconduct—those statements are inadmissible hearsay. If the Court admits the opinion at trial, it will give the jury a limiting instruction.

**e. Expert Dr. Nancy Franklin's Testimony and Affidavit**

Defendants rely on Plaintiff's expert Dr. Nancy Franklin's testimony and affidavit, which Plaintiff used in his 2021 habeas petition and in the 2021 vacatur hearing. Defendants argue they are admissible as opposing-party statements—specifically non-hearsay adoptive admissions under Fed. R. Evid. 801(d)(2)(b)—and prior testimony under Fed. R. Evid. 801(d)(1). Plaintiff disagrees.

First, Defendants abandon their prior-testimony argument in their reply, asserting that expert-witness disclosure, which they did not make and which would be required to make the prior-testimony exclusion applicable, is irrelevant, because "Dr. Franklin's statements are admissible as adoptive admissions under Rule 801(d)(2)(B)." ECF No. 183 at 18. Defendants are right to abandon their prior-testimony argument, which has no merit. *See* Pl's Opp. Br. at 25–27, ECF No. 183.

---

[27] *See Strickland*, 609 S.W.2d at 394 ("Appellant charges error to: (1) sufficiency of evidence to convict of capital murder; (2) sufficiency of the indictment; (3) seizure of evidence; (4) state's closing argument; (5) use of MAI-CR instructions rather than MAI-CR 2d instructions; (6) in-court identification; (7) death penalty qualification of prospective jurors during voir dire; and (8) failure to charge second degree murder.").

[28] The "doctrine of completeness" does not require a contrary result. As noted above, it is only the portions of a document "that in fairness ought to be considered at the same time" as other admitted portions or the portions of the document necessary to avert "misunderstanding or distortion" that the adverse party may require. Here, fairness would not be served by admitting a statement about an issue that was not properly before the Missouri Supreme Court along with statements about issues that were. To do so would introduce misunderstanding and distortion, not avert it.

As to Defendants' adoptive-admissions argument, the parties do not point to, and the Court has not found, a binding Eighth Circuit case concerning the scope of adoptive admissions and expert testimony. Defendants rely on *Pernix Ireland Pain Dac v. Alvogen Malta Operations Ltd.*, 316 F. Supp. 3d 816 (D. Del. 2018), which surveys cases from various courts and synthesizes a rule from them. The Court finds the District of Delaware's reasoning persuasive and the rule it derives applicable here.

Under Rule 801(d)(2)(B), an adoptive admission "is one the party manifested that it adopted or believed to be true." Whether an expert's statement may be regarded as an adoptive admission—and therefore not hearsay—depends on whether "the circumstances in which the statement is made, used, or proposed to be used indicate that the party supports the statement as representing its position." *Pernix Ireland Pain Dac*, 316 F. Supp. 3d at 824. This is "a much more restrictive scope" than "admissions based on agency [under] Rule 801(d)(2)(C)." *Id.* The mere fact of offering expert testimony does not automatically make every statement of the expert within the scope of that testimony the offering party's adoptive admission; rather, "admissibility under Rule 801(d)(2)(B) depends on a finding that the party has specifically adopted each statement at issue made by the expert." *Id.* So, if a party calls an expert witness "to prove a particular fact and the witness . . . so testifie[s], the party will be held to have adopted the expert's testimony on that point as an admission." *Id.* at 824–25. Moreover, "the mere fact that the party has acted (or failed to act, in the case of an admission by silence) in some way in reference to the statement or information (as by repeating it or retaining it) is not sufficient, standing alone, to justify a finding that there has been an adoption. Instead, the surrounding circumstances, including the circumstances and nature of the underlying statement itself, must be examined to determine whether an intent to adopt the statement is fairly reflected by the act or failure to act which is in

question." *White Indus., Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1062 (W.D. Mo. 1985) (citation omitted).

Similarly, when a party cites a particular expert statement for its truth in a court filing, the party adopts the statement as its own. *See Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, No. 1:17-CV-01079-RCL, 2019 WL 6910168, at *2 (D.D.C. Oct. 22, 2019). A particular citation may implicate the entire report in limited circumstances where the entire report is necessary to explain and support the particular citation. *See id.* (holding party's specific citation of expert report's conclusion—that opposing party did not properly address a rodent problem at a grocery store—as "the *only* source cited for that proposition . . . opened the door to the entirety of the report, which serves as important context and support for that finding" (emphasis in the original)).

Here, Plaintiff has adopted Dr. Franklin's written statements in places where he quotes or summarizes them. *See, e.g.*, Pl.'s 2021 Habeas Petition ¶¶ 240–242, ECF 148-1 at 29; P's 2021 Habeas Petition, Sugg's in Support, ECF No. 148-35 at 54–55. But Defendants' argument—that Plaintiff's quotation from Dr. Franklin's affidavit and attachment of it to his habeas petition means Plaintiff necessarily adopted the whole affidavit as his own admission—is unavailing. Defendants must show, and they have not, that the portions Plaintiff explicitly adopts through quotation or summary require the adoption of the whole affidavit for context and support.

The same is true of Dr. Franklin's testimony at the vacatur hearing. Plaintiff called Franklin to prove a particular fact—that Douglas's eye-witness identification was unreliable—and she so testified. *See* ECF 178-2 at 7. Plaintiff has adopted that statement. Plaintiff likewise adopted Franklin's statements his counsel summarized at the vacatur hearing. *See* ECF No. 148-37 at 39–40, 42, 45. These citations are manifestations that Plaintiff believed those statements to be true: he used them to support his argument for vacatur.

But these particular adoptions, without more, do not amount to a manifest adoption of every single statement in Franklin's report and testimony. *Pernix Ireland Pain Dac*, 316 F. Supp. 3d at 824 ("[A]dmissibility under Rule 801(d)(2)(B) depends on a finding that the party has specifically adopted each statement at issue made by the expert."). The record is replete with Plaintiff's direct and summary citations to Franklin's written and oral testimony, citations that clearly show his adoption of them. These are admissible as adoptive admissions. Statements Plaintiff has not manifested he has adopted or believes to be true are not admissible merely because they happen to be from the same expert.[29]

Accordingly, the statements of Dr. Franklin that Plaintiff uses directly in his filings and has otherwise specifically adopted are attributable to him and admissible as opposing-party statements. But Dr. Franklin's testimony as a whole cannot be attributed to him simply because he cites portions of it. Defendants must show (1) that other parts are necessary for important context and support for Dr. Franklin's finding or (2) that other parts are necessary for the sake of fairness or understanding to invoke the doctrine of completeness.

**Conclusion**

No ruling in this order admitting evidence for summary judgment binds the Court at trial. The Court in its discretion may revisit any admitted evidence under Rule 403 to avoid unfair

[29] Defendants' reliance on *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349 (5th Cir. 1983), for the proposition that Plaintiff is bound by all of Franklin's testimony at the vacatur hearing because his attorney was silent in response to certain statements she made is misplaced. In *Fox*, the attorney for the plaintiff who proffered the expert specifically solicited testimony based on one theory, about which he had instructed the expert. The attorney acquiesced to the testimony and then immediately sought to elicit testimony from the plaintiff supporting the opposite theory. *See id.* at 1351. The district court made a summary ruling to exclude the second theory, and the Fifth Circuit affirmed on the merits of that ruling and noted, "in light of the high jury prejudice behind the expert's statements and Fox's silent acquiescence to the testimony of his own witness, a witness who based his testimony on the information that Fox's lawyer himself had provided, it worked no unfairness to Fox to issue a summary ruling on his Jones Act status." *Id.* at 1354, 1356. Defendants do not allege that anything of the sort has happened with the expert here.

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence.

**IT IS SO ORDERED.**

Date: November 6, 2026

/s/ Greg Kays
GREG KAYS, JUDGE
UNITED STATES DISTRICT COURT